Filed 1/8/26  P. v. Holland CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>CHRISTOPHER LEE HOLLAND,<br><br>    Defendant and Appellant. | C102408<br><br>(Super. Ct. No. STK-CR-FE-2020-0013878) |

A jury found defendant Christopher Lee Holland guilty of two murders, two counts of robbery, and one count of burglary.  As to each murder, the jury found true three special circumstances.  The trial court imposed six separate prison terms of life without the possibility of parole (LWOP)--one LWOP sentence for each special circumstance finding for each murder conviction.

1

Defendant contends there was insufficient evidence to support the robbery conviction and the robbery-murder special circumstance finding as to one of the victims. He adds that the trial court erred in imposing three separate LWOP sentences for each murder conviction. As to the first claim, we disagree. As to the second claim, the People concede the error, and we agree with the parties. We will modify the judgment to impose one LWOP sentence for each murder conviction and affirm the judgment as modified.

## FACTS AND PROCEEDINGS

The People charged defendant with the murder of James and Mary Reiswig (Pen. Code, § 187, subd. (a)),[1] first degree burglary (§ 459), and the first degree robbery of both murder victims (§ 212.5, subd. (a)). As to each murder, the People alleged the special circumstances of multiple murders (§ 190.2, subd. (a)(3)), murder while engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)), and murder while engaged in the commission of a burglary (§ 190.2, subd. (a)(17)(G)). The People also alleged as to each murder and each robbery that defendant personally and intentionally discharged a firearm causing death. (§ 12022.53, subd. (d).) As to the burglary, the People alleged that defendant personally used a firearm. (§ 12022.5, subd. (a).) The People also alleged two prior strike convictions.

At trial, the People introduced evidence that in early December 2020, defendant asked an acquaintance, C.G., to help commit a robbery. C.G. did not agree to do so.

On December 17, 2020, the victims' son and granddaughter went to the victims' home to check on them. When they arrived, the back door to the house was already open. The son discovered his mother, Mary, lying unresponsive in her bed with blood on her face, and his father, James, lying on the floor by the foot of Mary's bed with his legs extending into the hallway. An autopsy determined that both victims died from multiple

---

[1] Undesignated statutory references are to the Penal Code.

chop injuries and a single penetrating gunshot wound to the head. Mary's cellphone and some of her jewelry were missing. No bullet casings were found at the scene.

An expert in scene reconstruction testified that, based on the bloodstain pattern and other evidence, the most likely scenario was that the perpetrator entered through the back door and first incapacitated Mary in her bedroom. The perpetrator then went to the living room to incapacitate James before returning to the bedroom to ransack it. Later, James got up and encountered the perpetrator again in the kitchen, hallway, and outside Mary's bedroom. A less likely but also possible scenario was that James was initially attacked in the living room before Mary was later attacked in her bedroom. In either scenario, the perpetrator initially attacked James in the living room, and then subsequently confronted James in the kitchen, hallway, and outside Mary's bedroom.

The victims' son testified James owned several firearms that were usually kept on the gun rack in a spare bedroom. One of those firearms was a .22-caliber handgun that was missing after the incident. The victims' daughter testified the .22-caliber handgun was sometimes kept in the laundry room. When firing that handgun, bullet casings do not discharge from the gun. The bullet fragment recovered from James and the bullet recovered from Mary were both .22-caliber. Neither bullet was fired from the two .22-caliber rifles that remained in the house.

At the time of the incident, defendant lived with his then-girlfriend, who was previously married to the victims' son. Investigators found defendant's DNA in a bloodstain in the victims' home. GPS data placed defendant's car near the victims' home around the time of the incident. Investigators also found shoeprints outside the home matching shoes found at defendant's home. Defendant's then-girlfriend testified that on the night of the crimes, defendant told her he "had to go clean up a mess that would ruin his life."

Sometime after the murders, defendant met with C.G. and indicated a robbery had gone badly. C.G. drove defendant to a friend's house and then back to defendant's car. Before they parted ways, defendant thanked C.G. for helping him and gave C.G. a gold bracelet. The gold bracelet was later determined to be Mary's.

Defendant testified on his own behalf, denying that he had killed the victims or entered their home. He claimed that someone else must have driven his car to the victims' home and said he had "[n]o clue" how his DNA was found there. He also claimed he had given C.G. a bracelet different than the one that belonged to Mary.

The jury found defendant guilty of the first degree murder of both victims and all other charged offenses. The jury found true the three alleged special circumstances as to each murder but deadlocked on the firearm allegations. The trial court found true the alleged prior strike convictions.

For the first degree murder of James, the trial court sentenced defendant to three consecutive terms of LWOP, one for each of the special circumstances found true by the jury. For the first degree murder of Mary, the court also sentenced defendant to three LWOP terms based on each of the special circumstances found true by the jury, but stayed the LWOP term imposed for the burglary-murder special circumstance. The court sentenced defendant to 25 years to life imprisonment for each robbery and the burglary and stayed all three sentences under section 654.

Defendant timely appealed.

## DISCUSSION

Defendant raises two claims on appeal. First, he argues there was insufficient evidence to prove the robbery and robbery-murder special circumstance as to James. Second, he contends the imposition of multiple LWOP sentences for each murder conviction was error.

4

# I

*Insufficient Evidence of Robbery and Robbery-Murder Special Circumstance*

In assessing a claim of insufficient evidence, we " ' "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329.)  We presume the evidence of each element of the offense was sufficient, and defendant bears the burden of affirmatively demonstrating otherwise.  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573-1574.)  To meet this burden, defendant must do more than just recite his own evidence or portray the available evidence in a light favorable to him.  (*Ibid.*)

" '[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*People v. Pham* (2009) 180 Cal.App.4th 919, 924-925.)  "We must accept all logical inferences that the jury may have drawn from circumstantial evidence." (*People v. Lucero* (2019) 41 Cal.App.5th 370, 411.)  " 'If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Ibid.*)

"Robbery is the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear." (§ 211.)  To prove the robbery-murder special circumstance, there must be substantial evidence of a robbery.  (*People v. Morris* (1988) 46 Cal.3d 1, 19, disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535.)

5

Case law has more precisely defined the statutory elements of robbery. The "taking" element has two aspects: " '(1) achieving possession of the property, known as "caption," and (2) carrying the property away, or "asportation." ' " (*People v. Sexton* (2019) 37 Cal.App.5th 457, 469.) The "force" element must consist of "some quantum of force in excess of that 'necessary to accomplish the mere seizing of the property.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 995.) The forcible act must be "motivated by the intent to steal," but need not "include an intent to apply force against the victim or to cause the victim to feel fear." (*Id.* at pp. 991-992.)

Case law also defines the necessary timing for these elements. "[R]obbery in California is a continuing offense." (*People v. Gomez* (2008) 43 Cal.4th 249, 262.) "[A] taking is not over at the moment of caption; it continues through asportation." (*Id.* at p. 256.) Thus, "a robbery can be accomplished even if the property was peacefully or duplicitously acquired, if force or fear was used to carry it away." (*Ibid.*) "[A]sportation is not confined to a fixed point in time. The asportation continues thereafter as long as the loot is being carried away to a place of temporary safety." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. omitted.) "The force or fear element of robbery can be satisfied during either the caption or the asportation phase of the taking." (*Gomez*, at p. 261.)

As an initial matter, defendant argues there is no substantial evidence he took James's .22-caliber handgun. We disagree. The victims' son and daughter both testified that James owned a .22-caliber handgun and that it was kept in the house. It is undisputed that the handgun was missing from the home after the robbery. The trier of fact could reasonably infer from this evidence that defendant took the handgun. (Cf. *People v. Nelson* (2011) 51 Cal.4th 198, 211 [concluding there was substantial evidence of a taking where the victim had his car keys before the murder and the keys were "not found on his person or at the scene" after the murder].)

6

Defendant submits the evidence of robbery as to James was insufficient in two further respects.  First, he contends there was insufficient evidence that any personal property was taken from James's "immediate presence."  According to defendant, the evidence established James was not:  (1) in Mary's bedroom when her cellphone and jewelry were taken; or (2) in the laundry room or the spare bedroom, the two rooms James's handgun may have been taken from.

This argument fails to persuade.  Our Supreme Court has explained:  "The generally accepted definition of immediate presence . . . is that ' "[a] thing is in the [immediate] presence of a person, in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it." ' " (*People v. Hayes* (1990) 52 Cal.3d 577, 626-627.)  "[I]mmediate presence ' "must mean at least an area within which the victim could reasonably be expected to exercise some physical control over [the] property." ' [Citation.]  Under this definition, property may be found to be in the victim's immediate presence 'even though it is located *in another room of the house*, or in another building on [the] premises.' " (*Id.* at p. 627, italics added.)

Here, defendant contends that because there is no evidence James was in the specific rooms from where the property was taken, there is insufficient evidence the property was taken from his "immediate presence."  The premise of this argument is not entirely sound, as a factfinder could reasonably infer James *was* in Mary's bedroom based on the fact that James's body was found there.  Beyond that, there is no dispute James was in the *house* when the takings occurred.  From this evidence, the jury reasonably could have found that James exercised sufficient control over the rooms from which the property was taken to satisfy the immediate presence requirement.  This is especially true given the evidence that defendant may have incapacitated James prior to taking personal property from other rooms.  (Cf. *People v. Holt* (1997) 15 Cal.4th 1385A, 675 ["the property taken in the kitchen was taken from '[the victim's] immediate

7

presence' since the kitchen was in an area over which [the victim] had control until defendant subdued her"]; *People v. Reeves* (2001) 91 Cal.App.4th 14, 52 ["Areas of the victims' apartments outside the bathroom were areas over which they had control before appellant coerced them into the shower"].)

Second, defendant contends that, while force was used, there is no substantial evidence that the takings were *accomplished by means* of force or fear on James. In his view, the evidence only establishes that the takings occurred either before or after James was attacked, and thus James was not attacked in order to accomplish the takings. This argument fails because, as discussed above, the force or fear element can be satisfied either during the caption of the property or the asportation. Here, there is evidence James confronted defendant after defendant had ransacked Mary's bedroom, and that defendant attacked and ultimately murdered James before leaving the home. Accordingly, there is sufficient evidence to satisfy the force or fear element for the robbery of James.

Resisting this conclusion, defendant relies on *People v. Morris*, *supra*, 46 Cal.3d 1, but that case is inapposite. There, the victim was fatally shot in the restroom of a public bathhouse. (*Id*. at pp. 10, 19-20.) He was "entirely nude except for shoes and socks" and there was "no evidence that any personal property was in the victim's possession at the time of the murder." (*Id*. at p. 20.) A witness saw a man with the defendant's features standing in the doorway of the restroom and firing a gun. (*Id*. at p. 10.) After the murder, the defendant attempted to use a credit card belonging to a friend of the victim. (*Id*. at pp. 11, 20.) That friend had lent this credit card to the victim two months prior to the murder. (*Id*. at p. 20.) Our Supreme Court reversed the robbery conviction and set aside the robbery-murder special circumstance, in part because there was insufficient evidence "that the taking was accomplished either before or during the killing by means of force or fear." (*Id*. at p. 21.) The court explained it was entirely possible the defendant had taken the credit card at some point before the shooting or that

8

the victim "volunteered the credit card to his assailant as a form of consideration for sexual services." (*Id*. at p. 20.)

In *Morris*, there was little to no evidence about how or when (or even if) a robbery occurred and thus the record did not support a reasonable inference that a taking was accomplished by means of force or fear. Here, in contrast, the evidence readily supports the inference that the takings occurred during the home invasion in which defendant attacked and killed James.

Because substantial evidence supports the robbery conviction, we reject defendant's challenge to that conviction and the robbery-murder special circumstance.

## II

### *Multiple LWOP Sentences for Each Murder Conviction*

Defendant argues the trial court erred in imposing multiple LWOP sentences for each murder conviction. The People agree, as do we.

Section 190.2, subdivision (a) provides that "[t]he penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if *one or more* . . . special circumstances has been found . . . to be true." (Italics added.) Multiple true special circumstance findings do not justify additional punishment. (See *People v. Montes* (2014) 58 Cal.4th 809, 874 [defendant "faced no additional punishment merely as a result of" additional special circumstance true finding].) Accordingly, the trial court's imposition of a separate LWOP sentence for each special circumstance finding as to each murder conviction was error. We modify the judgment to strike the two additional LWOP sentences imposed for each murder conviction and direct the trial court to amend the abstract of judgment to reflect this change.

9

## DISPOSITION

The judgment is modified to reflect a single LWOP sentence for each murder conviction. We direct the trial court to amend the abstract of judgment to reflect this modification, and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.


                                                        /s/
                                                 Duarte, J.

We concur:


    /s/
Mauro, Acting P. J.


    /s/
Wiseman, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.